**J. C. DECKER, Inc., v. UNITED STATES.**
No. 46803.

United States Court of Claims.
Nov. 7, 1950.

Robert F. Klepinger, Washington, D. C., William H. Webb, Washington, D. C., on the brief, for plaintiff.

John R. Franklin, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

LITTLETON, Judge.

On February 11, 1942, plaintiff contracted to manufacture for defendant 35,000 canvas folding cots at $2.60 each, f. o. b. factory. The destination of each shipment was to be designated by defendant's Chicago Depot Quartermaster. The specifications provided, among other things, the kinds of wood that could be used and provided also that the wood should not contain more than 18 percent moisture. Final inspection of each shipment was to be made at the receiving depot except when it was more practicable to make it at the factory. However, the Government reserved the right to conduct inspections at the factory; the scope and extent of the factory inspections were to be as determined by the Contracting Officer. Article 4 of the contract gave the Government the right to reject or require the correction of articles which were defective or not in conformity with specifications. Article 6 provided that plaintiff should be responsible for the cots until they were delivered at the designated points and that it should bear the risk on rejected articles after notice of rejection.

The canvas for the cots was furnished by the Government and was cut by plaintiff in its own factory. Its subcontractor manufactured the wood and metal parts, assembled and packed the cots, and shipped them to the designated points. Defendant stationed inspectors at plaintiff's plant and at the plant of its subcontractor. These inspectors examined, among other things, the moisture content of the wood being used. However, they were not authorized to make a final inspection and did not purport to do so. Final inspection of every shipment was made at the designated delivery point.

This suit concerns the last four shipments under the contract. These shipments, four separate carloads, were consigned to the Depot Quartermaster, Columbus General Depot, Columbus, Ohio. The dates of departure, arrival, and first inspection are tabulated in finding 6. The first car was placed at the depot on July 31, 1942, and the last car on August 28, 1942. The preliminary inspections, which were 5 percent inspections, revealed the same conditions in all four cars: the cots in all had been damaged by moisture; furthermore, at least in the first two cars, which were later given complete inspections, the machining of some of the wood parts was unsatisfactory and some wood had been used which was not called for in the specifications. On August 29, 1942, plaintiff was informed that the four shipments were unacceptable. After further correspondence, the shipments were returned to plaintiff. They were finally accepted after plaintiff had reconditioned the cots and made some replacements of parts. Plaintiff seeks to recover the expenses it incurred in reconditioning the cots. It alleges that the imperfections in the cots were caused by the defendant's failure to unload and handle the cots promptly upon their arrival at the Quartermaster Depot.

The evidence does not sustain this contention. Instead it reveals that the damage was caused by the excessive moisture in the wood which was used in making the cots. Reports from defendant's inspector at the subcontractor's plant had suggested that some of the wood being used was too wet. The condition of these cots on arrival at the Quartermaster Depot confirmed this observation. The cots were shipped in airtight and watertight cars. The summer heat and the lack of ventilation in the cars caused the moisture in the wood to be drawn to the surface of the pieces while they were in transit. As a result the cots were damaged.

The table in finding 6, which was stipulated, indicates that ten, seven, thirteen, and fifteen days, respectively, elapsed between the arrival of each car in Columbus and the preliminary inspection at the Quartermaster Depot. However, it also reveals that the first car was given a 5 percent inspection five days after its arrival at the Quartermaster Depot, the second car the day of its arrival, and the third and fourth cars the day after arrival. It appears, therefore, that defendant made its preliminary inspection of each car promptly.

Plaintiff insists that it was a week or ten days, or even longer, after the preliminary inspection of the first two cars before they were unloaded and given a complete inspection. It is not clear from the evidence exactly when the complete inspections of these cars were made, and we think it is not particularly material. The last two cars never were given complete inspections. The condition of all cars when first opened made it apparent that the shipments were too damaged to be acceptable. The 5 percent inspections revealed the same conditions in all four cars. The evidence sufficiently establishes that the defendant properly refused to accept the cots until their defects were corrected and that these defects were not attributable to unreasonable acts or omissions of defendant. The record does not show that under the terms of the contract there was any responsibility on the defendant to see that the cars were immediately placed by the railroad at the Quartermaster Depot after their arrival at Columbus; but assuming that the defendant should have urged the railroad to place the cars at the Depot as promptly as possible for inspection and unloading, the record fails to show that in the circumstances the Government was negligent or delayed unreasonably in this regard.

Plaintiff suggests that since defendant had inspectors on the spot during manufacture, it could not reject the cots after shipment. The plant inspectors, however, were not authorized to make final inspections and did not purport to do so. The contract provision was that under these circumstances final inspection should be at the destination point.

Plaintiff also argues that the railroad cars on which the cots were loaded were unsuitable for their transportation. This is a matter between plaintiff and the railroad, not between plaintiff and the Government. As between plaintiff and the Government, the contract controls. It provided that plaintiff should be responsible for the cots until they were delivered at the designated points, that is, the Quartermaster Depot, and that defendant should have the right to reject or require the correction of defective cots. See finding 4.

These provisions of the contract are also a sufficient answer to plaintiff's argument that its liability to correct damage is negatived by the fact that, since the cots were shipped on Government bills of lading with the Government paying the freight charges, title to the goods passed to the Government on consignment. Regardless of when title passed, defendant had the right under the contract to require the correction of these goods. Plaintiff is not entitled to be reimbursed its expenses in making the correction.

Plaintiff is not entitled to recover and its petition is dismissed. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.